Louis Richter, complainant,

*v.*

North American Building and Loan Association et al., defendants.

[Decided March 16th, 1932.]

*Mr. Arthur T. Vanderbilt,* for the complainant.

*Mr. Joseph J. Corn,* for the defendants Henry Silverman, Julius Silverman, Samuel Silverman, Samuel Levitas, Rosie Wachtel and Anna Litowitz.

Church, V. C.

This is a bill to impress a constructive trust in favor of complainant on a prepaid building and loan certificate for $4,000. The certificate is dated March 15th, 1927, and reg-

istered in the name of Ella Feinstein, trustee for her six children. The following appear to be the undisputed facts:

Complainant was born in 1905. At the age of two years he went to live with his grandparents, Jacob and Ella Feinstein, where he has been ever since except as hereafter noted. The personal defendants are children of Mrs. Feinstein by a prior marriage. In 1922, or before, Mr. Feinstein conducted a bicycle business, and he borrowed $300 from his wife's children. On January 31st, 1922, he went into the radio business. He sold the bicycles for $300 and used that amount as capital in the new venture. A firm name certificate for "Radio Cycle Shop" was signed, sworn to and filed by Mr. Feinstein in the Essex county clerk's office, stating that he was conducting business at 37 South Orange avenue, Newark, under that name and that he was the only person connected with it as owner. On January 6th, 1923, a firm name certificate for "Radio Cycle Company" was signed, sworn to and filed by Mr. Feinstein in the Essex county clerk's office, stating that he was conducting business at 37 South Orange avenue, Newark, under that name, and that he was the only person connected with it as owner. These certificates were filed at the suggestion of complainant. On October 14th, 1926, complainant having in the meantime become of age, he and Mr. and Mrs. Feinstein executed a certificate of incorporation for "Radio Cycle Corporation," which was filed in the Essex county clerk's office. Complainant had six shares, Mr. Feinstein three shares, and Mrs. Feinstein one share. Among the objects were "to acquire and take over as a going concern the business which has been carried on or is being carried on by Louis Richter and Jacob Feinstein under the trade name of Radio Cycle."

From June 17th, 1925, to January 1st, 1927, Mr. Feinstein deposited various sums of money in a savings account at Springfield Avenue Trust Company of Newark. On February 15th, 1927, he withdrew $2,800; on December 1st, 1930, he withdrew $382.11; a total of $3,182.11. In March, 1927, he gave Samuel Levitas, one of the defendants, $4,000 with which was purchased the certificate above mentioned.

Mrs. Feinstein died November 14th, 1930. In 1920 complainant left his grandparents and remained away until 1921. Complainant says that his grandfather came to him and urged him to return; that the grandfather said he would turn over the business to him and that all the grandfather wanted in return was support for himself and his wife while they lived. He returned and worked in his grandfather's business. He put no money into it. He signed checks as attorney. The Newark directories of 1924, 1925 and 1926 gave Jacob Feinstein as proprietor of Radio Cycle Company. The grandfather was in the store every day. He received no salary. In September, 1928, the corporation was sold for $7,500, which money complainant took. He turned all moneys he received from the business over to his grandfather. His grandfather gave him certain sums from time to time, keeping always a large cash balance "with which to buy merchandise so that the manufacturers could not trace the channels from which the purchase was made," according to defendant, or as complainant more politely puts it "because of the necessity of having ready cash for the purchase of radios from certain types of dealers." No accounts were kept by either the grandfather or the complainant. No arrangement was made as to any certain sum the grandfather was to have for his support. There is no evidence that the style of his living was changed in any way after the grandson's return to the family in 1921. They are still living together.

Complainant who put nothing in the concern except, perhaps, his business ability which developed when he was a boy of sixteen, has $10,000 in prepaid building and loan stock, sixty-five shares in a building and loan association, and $15,000 in Guardian Trust Company stock. The grandfather says he turned the business over absolutely to complainant and that the money—$4,000—for the certificate was wrongfully withheld by him. Complainant says he discovered this appropriation only in 1930—after his grandmother's death—when Mrs. Levitas, wife of one of the defendants, so informed him. He then accused his grandfather, who con-

fessed. Mrs. Levitas denies absolutely that she ever said any such thing. She is corroborated by her daughter, who was present at the interview when the alleged statement was supposed to have been made. The only support for this misappropriation is the grandfather's testimony.

The general proposition of law regarding such evidence is:

"On the other hand it is equally well settled that no declarations of a former owner of the property, made after he had parted with his interest therein, can be received in evidence to effect the legal or equitable title to the premises. These rules are applicable to resulting trusts." *26 R. C. L. 1229* § *75*.

I see no reason why the same rule should not apply to constructive trusts. Assuming, however, that the testimony is relevant, is it sufficient to meet the requirements of the decisions which hold that the burden of proof rests with complainant and that the evidence must be clear, unequivocal and satisfactory? In *Sing Bow* v. *Sing Bow, 30 Atl. Rep. 867,* Vice-Chancellor Green said:

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

"The burden of proof is also on the complainant to establish a constructive trust. In this case it rests on the charge of fraud, which must be proved.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

"The burden of proof is also on the complainant to show that the money used in the purchase was his own."

*39 Cyc. 192:* "A constructive trust cannot be established by a mere preponderance of evidence, but must be established by evidence which is clear, definite, unequivocal, and satisfactory."

In *Heinisch* v. *Pennington, 73 N. J. Eq. 456,* Vice-Chancellor Emery said (at *pp. 461 et seq*):

"In all cases of this kind, courts of equity act with the utmost caution, and do not interfere, unless the promise and the intended fraud on the beneficiary are established by clear and satisfactory proof. *Williams* v. *Vreeland (Court of Errors and Appeals, 1880), 32 N. J. Eq. 734, 737."*

It seems surprising to me that Mr. Feinstein now, three

years after the transaction took place, and after the death of his wife, who could have given very enlightening testimony regarding it, should come before this court and frankly state that he embezzled the money of another; and in order to make out the case against himself, should repudiate the written statements he made in the trade certificates in which he unequivocally stated he was the sole owner of the business. Either those statements, sworn to, or the sworn statements before me, are false. Therefore, little reliance can be placed on his testimony. There is no evidence that the specific $4,000 that went into the certificate was not his own money. He says he took it in small sums from the business, but there is no proof of amounts or dates except the two withdrawals I have noted. He also says that he and his grandson agreed that he was to take from the business sufficient for the support of himself and his wife. He does not say what this sum was to be, and it is possible that he saved the $4,000 out of what he was allowed for maintenance. The burden of proof is on the complainant to show that the money used in the purchase was his. See *Sing Bow* v. *Sing Bow, supra.*

Moreover, there is the question as to whether the grandson's money, during his minority, did not legally belong to the grandfather. Complainant contends that he was emancipated from any control which would ordinarily be exercised by one *in loco parentis.* I find it difficult to believe that Mr. Feinstein, as he says, surrendered all control of his business to a boy of sixteen on the mere verbal understanding that he would be taken care of—in what manner or to what extent does not appear. Vice-Chancellor Garrison in *Tuite* v. *Tuite, 72 N. J. Eq. 740* (at *p. 743*), says:

"It passes belief that a mother would enter into a partnership with her own children (the eldest of whom, a girl, was sixteen years and the youngest of whom was one month old), and would agree that each should have an equal share of the profits, while she, so far as they allege, was alone responsible for all the losses."

The case before me is even more surprising. The business—if we believe the grandfather—was turned over to the

grandson absolutely with no prospect of profits. A vague arrangement for support is the only consideration. The grandfather, however, was to be responsible for all losses because he held himself out to the public as the sole owner in the trade certificates and directories already mentioned.

Finally, has the complainant an adequate remedy at law? He seeks in effect the return of $4,000. There is no proof that either the grandfather or the individual defendants are insolvent. Why should he not first reduce his claim to judgment and then proceed to its collection?

With these facts before me, I am unable to see that complainant has sustained the burden of proof by clear, unequivocal and satisfactory testimony. Especially is this so when it is realized that the only evidence to support the claim is given by one who says now he never owned the business, but who heretofore swore he was the only person connected with it as owner. I will advise a decree dismissing the bill.